Date signed June 28, 2005



**E. STEPHEN DERBY**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| BALTIMORE EMERGENCY SERVICES II, | * | Case No. 02-6-7576-SD |
| LLC; PHYAMERICA PHYSICIAN GROUP | * | through 02-6-7815-SD |
| INC.; ECS HOLDINGS, INC.; | * | Chapter 11 |
| SCOTT MEDICAL GROUP, LLC; et al., | * | |
| | * | Jointly Administered Under |
| Debtors. | * | Case No. 02-6-7584-SD |
| | * | |
| | * | |
| * * * * * * * | * | |
| | * | |
| STERLING HEALTHCARE, INC., | * | |
| and | * | |
| THE OFFICIAL COMMITTEE OF TORT | * | |
| PLAINTIFFS CREDITORS, | * | |
| | * | |
| Plaintiffs, | * | |
| vs. | * | Adversary No. 04-2322-SD |
| | * | |
| AMERICAN INTERNATIONAL | * | |
| SPECIALTY LINES INSURANCE | * | |
| COMPANY, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

1

MEMORANDUM OPINION CLARIFYING AND
INTERPRETING CONFIRMATION DOCUMENTS
**With Typographical Corrections**

### BACKGROUND

On November 8, 2002 and November 11, 2002, 250 of the Debtors (the "November Debtors") filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Commencing on February 28, 2003 and April 22, 2003, 17 additional Debtors (the "New Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each of the November Debtors and the New Debtors (together, the "Debtors") continued to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 until the assets were sold.  The Debtors are each affiliates, as such term is defined in 11 U.S.C. § 101(2) of the Bankruptcy Code.

On November 20, 2002, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

On October 7, 2003 the court approved the Debtors' Disclosure Statement, as amended, dated October 1, 2003, for Debtors' Second Amended Joint Plan of Reorganization.  The documents had been heavily negotiated among the Debtors, the Committee and National Century Financial Enterprises, the Debtors' primary lender and largest creditor ("NCFE").  Attached to Debtors' Plan was an Alternative Dispute Resolution Procedure for Treatment of Medical Malpractice Claims (the "ADR").  On October 15, 2003, the U.S. Trustee appointed the Tort Committee.

On November 11, 2003, Debtors conducted an auction for the sale of substantially all of the Debtors' assets. The Qualified Bidders were Best Practices, Inc.; M&A Acquisition Corp. ("M&A"), a company owned by David Schillinger and Jeffrey Schillinger; PhyAmerica Acquisition Corp. ("PAC"), a company owned by Dr. Steven M. Scott; and RDA PhyAm, a company owned by affiliates of Resurgence Asset Management, LLC and Dr. Steven Dresnick, now known as Sterling Healthcare, Inc. ("Sterling"). At the conclusion of the Auction, NCFE determined that Sterling was its Successful Bidder; the Committee determined that M&A was its Successful Bidder; and the Debtors determined that PAC was its Successful Bidder. Because the parties were not able to agree upon which bidder should be the Successful Bidder, under the pre-approved Bidding Procedures, the Court was to make the final determination of the Successful Bidder pursuant to certain specified criteria.

The Court conducted the Sale Hearing on November 20, 21, 24 and 25, 2003 and the Confirmation Hearing on December 1 and 2, 2003. At the conclusion of the Sale Hearing, the Court selected Sterling's bid, as set forth in that certain Asset Purchase Agreement among Sterling and certain of the Debtors with respect to the Debtors' emergency room operations (the "ER Asset Purchase Agreement"), as "highest and otherwise best" under the Bidding Procedures. The sale was closed on February 6, 2004, as of and pursuant to an Asset Purchase Agreement dated February 1, 2004.

Part of the purchase price paid by Sterling was the assumption of Debtors' medical malpractice liabilities. Sterling also agreed to fund the medical practice liabilities through insurance. Section 2.13 of the Asset Purchase Agreement, attached as Exhibit C to the Court's December 17,

3

2003 Order Confirming the Second Amended Joint Plan of Reorganization of Baltimore Emergency

Services II, LLC and Its Affiliated Debtors [p. 1739],[1] provides as follows:

> 2.13.   <u>Provisions Applicable to Medical Malpractice Claims and Insurance.</u>
> Effective upon the Closing and subject to the terms, conditions and limitations of the
> Plan and the Plan ADR, R.D. PhyAm agrees to assume all medical malpractice
> liabilities of Sellers' contracted and employed physicians and other clinical providers
> who provide medical services in connection with the Acquired Assets, all in respect
> of claims relating to acts, events or omissions occurring prior to the Petition Date
> (the "Pre-Petition Medical Malpractice Liabilities"), and either to assume and agree
> to fund in accordance with their terms the insurance policies of Sellers that provide
> insurance coverage with respect to the Pre-Petition Medical Malpractice Liabilities
> or to procure alternative or replacement policies, so that Pre-Petition Medical
> Malpractice Liabilities can be liquidated and satisfied pursuant to the Plan and the
> Plan ADR.  Also effective upon the Closing, R.D. PhyAm agrees to assume all
> medical malpractice liabilities of Sellers' contracted and employed physicians and
> other clinical providers who provide medical services in connection with the
> Acquired Assets, all in respect of claims relating to acts, events or omissions
> occurring from and after the Petition Date through and including the Closing Date
> (the "Post-Petition Medical Malpractice Liabilities"), and either to assume the related
> insurance policies of Sellers or to procure alternative or replacement policies and
> further, from and after the expiration of any existing insurance policies with respect
> to Post-Petition Medical Malpractice Liabilities, R.D. PhyAm agrees to procure
> replacement policies on terms and conditions acceptable to R.D. PhyAm in its sole
> discretion that provide continued insurance coverage for the Post-Petition Medical
> Malpractice Liabilities with respect to claims made under such policies at any time
> on or prior to December 31, 2007.

Under the plain meaning of Section 2.13, Sterling, as successor to R.D. PhyAm, made two

separate commitments; it agreed both to assume the Sellers' medical malpractice liabilities and to

fund medical malpractice insurance policies for those liabilities.  Sterling's agreement to assume the

Debtors' medical malpractice liabilities is comprehensive.  Sterling agreed "to assume <u>all</u> medical

---

[1]  The signed Asset Purchase Agreement dated February 1, 2004 is contained in Exhibit
14 admitted at June 28, 2004 hearing in the main case, No. 02-6-7584-SD, on the Emergency
Motion to Compel R.D. PhyAm Acquisition Corporation to Provide Adequate Pre and Post
Petition Medical Malpractice Insurance Coverage filed by Creditor Official Tort Plaintiff
Creditors' Committee.

malpractice liabilities of Sellers' contracted <u>and</u> employed physicians <u>and</u> other clinical providers who provide medical services in connection with the Acquired Assets, . . . [for] acts, events or omissions occurring prior to the Petition Date" and "from and after the Petition Date through . . . the Closing Date" of the Asset Purchase Agreement. Sterling attempted to limit its assumption obligations by challenging in this court whether facilities where Sterling elected not to assume a hospital contract should be excluded from the definition of Acquired Assets. This court rejected Sterling's contentions, and the decision is presently under appeal.

As to Sterling's funding agreements, they were the subject of an Order in this case dated July 20, 2004, as corrected typographically by Order dated March 24, 2005. See Main Case Dkt Nos. 2336, 3332. As to Debtors' pre-petition medical malpractice liabilities, Sterling agreed either to assume and "to fund in accordance with their terms the insurance policies" of Debtors or to procure alternative or replacement policies of the same breadth and coverage. Asset Purchase Agreement, § 2.13. The purpose of this funding obligation was "so that" Debtors' pre-petition malpractice liabilities could "be liquidated and satisfied pursuant to the Plan and the Plan ADR." <u>Id.</u>

Although the language of Section 2.13 of the Asset Purchase Agreement is more abbreviated for postpetition medical malpractice liabilities through the closing date, the court found in its July 20, 2004 Order that Sterling's undertaking with respect to insurance was the same for Debtors' postpetition medical malpractice liabilities as for their pre-petition medical malpractice liabilities. Additionally, since the Debtors' medical malpractice insurance policies were claims made policies, Sterling was obligated to purchase tail insurance policies to cover post-petition medical malpractice claims made through December 31, 2007.

The present crisis is brought on because Debtors' two principal medical malpractice insurance policies are insolvent. Neither has sufficient coverage remaining to pay all claims covered by the policy. From the record presented to the court in this proceeding, the court is not able to determine the precise dollar amount of the coverage shortfall for each policy. However, the shortfalls are material. This conclusion is accepted by Sterling, the buyer and de facto administrator of the process for paying claims through the policies, the two insurance companies that issued the policies, and the Tort Claimants' Committee; and this bottom line conclusion is not challenged by other parties participating in this proceeding. It has been established by the record in this case that if administration of the payment of pre and postpetition malpractice claims against Debtors continues status quo, many claims will be paid in full and many will get nothing, although they are all in the same class. Such an inequitable result was not contemplated by the confirmed plan, which had been found to comply with 11 U.S.C. § 1123(a)(4).

The two policies are the Everest Indemnity master policy covering the claims period January 1, 2002 to April 1, 2003 (the "Everest -021 policy") and the AISLIC master policy (the "AISLIC -435 policy") covering the claims period April 1, 2003 to April 1, 2004. Sterling Exh. 6; AISLIC Exh. 2. April 1, 2004 was, of course, after the sale to Sterling was closed. Both policies are claims made insurance policies, and both have retroactive dates of January 1, 1991 (except the Everest retroactive date for Louisiana is January 1, 2002). Both policies were substantially self-funding, and the aggregate policy liability limits were defined by the amount of collateralized deductible deposits that were paid on the policies, subject to a cap. Each policy is an indemnity policy, in that it agrees to pay the liability of the named insureds.

6

The Everest policy has a cap of $16,000,000 in aggregate coverage, and its premium was fully paid for this aggregate coverage amount. [2]

The AISLIC master policy -435 is a self-funding policy. See Province Hospitals Exh. 25 for what appears to be the most complete version of the policy and its endorsements. The Coverage Period Aggregate Limit of Liability is determined by the amount of Collateralized Deductible Deposits that have been paid, plus a Credit Amount. Id. at Declarations, Sec. III(D) and Sec. IV(B)(1). Pursuant to the payment schedule in the policy, Debtors could have made Collateralized Deductible Deposits monthly that would have increased the Aggregate Limit of Liability under the policy to $19,000,000. Id. at Exh. 1. By endorsement, the cap on Collateralized Deductible Deposits was increased to $20,260,000. Id. at Endorsement No. 15. However, the Debtors did not fund the full amount of Collateralized Deductible Deposits that were due for the last couple of months that Debtors were debtors in possession. See Sterling Exh. 10. Further, Debtors' Joint Plan of Reorganization, as confirmed, appointed Charles Goldstein as Debtors' Chief Restructuring Officer effective December 12, 2003, in a concession to concerns of creditors. Confirmation Order, Sterling Exh. 1, p. 5, ¶ 5. Mr. Goldstein did not authorize full payment of the Collateralized Deductible Deposits that were scheduled after he became CRO, apparently because of cash flow problems, and Sterling did not make the Collateralized Deductible Deposits that came due after the February 1, 2004 effective date of its purchase.

---

[2] AISLIC included in its post-trial proposals a finding that the Everest -021 policy had a funded aggregate limit of $16,629,071, but the court has not been able to verify the actual amount in this record. The precise amount of the funded aggregate policy limit is not at issue in this proceeding, and it is not finally determined herein.

Funding of the AISLIC policy -435 for aggregate coverage of $18,734,155 was projected by the proponents of Debtors' joint plan of reorganization in Debtors' Disclosure Statement, but it did not occur, thus contributing substantially to the present shortfall in coverage. See Sterling's Exh. 3, p. 93. The actual funding was for an Aggregate Limit of Liability of only approximately $13.1 to $13.5 million. [3]

## I.

The starting point is to determine how the malpractice claims are treated under Debtors' confirmed plan of reorganization. See Sterling Exh. 1, 2. The Plan separately classified Tort Unsecured Claims as Class 4B, Art. II, Sec. 2.3(g). Tort Unsecured Claims are defined in Article I, Sec. 1.1 (UUUU) as ". . . any Unsecured Claim for personal injury or property damage allegedly arising from the tortious acts of any of the Debtors or their agents (including, without limitation, independent contract or employee physicians)." This definition encompasses medical malpractice claims. Article IV is titled: "PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN." Section 4.1(g) of Article IV provides: "Class 4B -- Tort Unsecured Claims. Each Tort Unsecured Claim shall be liquidated and satisfied pursuant to the Plan ADR." In plain language, therefore, the provisions of the Plan ADR control the treatment of Tort Unsecured Claims.

---

[3] AISLIC's Pretrial Memorandum recites the AISLIC -435 policy aggregate limits as $13,130,000 (see Dkt. No. 253); but the court has not been able to confirm the amount in this record, and the oral testimony of witnesses differed.

The Plan ADR was attached to the confirmation order as Exhibit B.  See Sterling Exh. 1, p. 5, ¶ F and Sterling Exh. 4.  It provides for the liquidation and treatment of Malpractice Claims. Malpractice Claims are those based on pre-petition events that are ". . . against (a) a Debtor or (b) a physician or other healthcare provider employed or contracted by a Debtor with respect to professional medical or clinical services rendered in the course and scope of the professional's contractual or employment relationship with a Debtor, or [c] against a hospital or other healthcare facility that contracted with a Debtor, in either event [of (b) or [c]], which has asserted or could assert a claim for reimbursement, contribution or indemnity against the Debtors with respect to such claim."  Sterling Exh. 4, Plan ADR, p. 3, ¶ I(B)(3).

The Plan ADR was the product of negotiations between Debtors and the Official Committee of Tort Claimants.  See Confirmation Order, Sterling Exh. 1, p. 5, ¶ F.  The Tort Claimants' Committee had been appointed by the U.S. Trustee after the court had approved Debtors' disclosure statement, which is very late in the process of developing a plan.  The Plan ADR is premised upon the payment of liquidated malpractice claims from Debtors' insurance policies that were assumed to be adequately funded and to have been funded to the disclosed limits, which assumptions were incorrect.  For these reasons and many other difficulties faced by those drafting modifications to the Plan ADR, not the least of which was the desire to respond to multiple special interests, the Plan ADR does not fully address the current insolvency of certain policies, and it contains provisions that are ambiguous and arguably inconsistent.

After entry of the plan Confirmation Order, the Debtors were required to serve by first class mail on each Malpractice Claimant, "or their counsel if known," the Confirmation Order, including the Plan ADR, and a Verification Form on which to elect to participate in the Plan ADR.  Sterling

Exh. 4, Plan ADR, p. 5, ¶ II(C).  If a Verification Form was not returned within 90 days, the claimant "shall be deemed to have waived its ability to participate in distributions from the Insurance Policies."  Id.  Unless a Malpractice Claimant was not properly served, "failure to elect to participate in the ADR Procedure will provide a basis for Debtors to assert that the Malpractice Claimant is forever barred from asserting any right or remedy to which such holder may otherwise be entitled against any Debtor or the Insurance Policies."  Id.

There were many exemptions and exclusions from the Plan ADR.  Holders of Malpractice Claims who entered into court approved stipulations with the Debtors or agreements with the Debtors were "exempt from the provisions of this Plan ADR and may exercise their rights under applicable non bankruptcy law." Id. at p. 3, ¶ I(C).  See also, id., p. 6, ¶ F.  Postpetition Malpractice Claimants were not required to participate in the Plan ADR, nor were holders of unknown prepetition malpractice claims, and their rights to proceed were not released.  Id. at p. 4, ¶s I(F) and (G).  Malpractice Claimants could proceed directly against non-Debtor third parties, except physicians.  Id. at p. 5, ¶ II(E).  " . . . [A]ny recovery against a non-Debtor physician who is employed or contracted with a Debtor shall be limited to insurance policies naming the physician as an insured unless such limitation on recovery would in any way impair the rights of a Malpractice Claimant to proceed, outside the ADR Proceeding, against a non-debtor which is not a physician employed by or contracted with a Debtor."  Id.  The indemnity and contribution claims of hospitals against the Debtors' malpractice insurance policies were preserved.  See Sterling Exh. 1, Confirmation Order, p. 23, ¶s 8, 12.  Rights of both pre and post petition holders of malpractice claims to proceed against non-Debtor third parties were generally preserved, except that actions against Debtors' covered physicians were limited to the insurance policies covering the physician

10

for Malpractice Claims.  See Sterling Exh. 4, Plan ADR, p. 5, ¶ II(E); p. 6, ¶ II(F); p. 4, ¶s I(F) and (G); and p. 14, ¶ VIII.

## II.

From a review of the Plan ADR as incorporated into the plan of reorganization, from the presentations made at the time of plan confirmation, from the initial actions of the various parties in interest following settlement of the sale to Sterling, and from the calculation of the elements of the purchase price that Sterling bid for Debtors' assets and which made Sterling the successful bidder, the elements of the intended treatment of malpractice tort claimants under Debtors' plan of reorganization can be determined.  Elements of the intended treatment of pre- and postpetition malpractice claims under Debtors' plan of reorganization included the following.

1)       Both the pre and postpetition malpractice claims against Debtors, their doctors, and their hospitals to the extent of Debtors' contractual indemnity and contribution obligations, would be satisfied solely from malpractice insurance policies, which were assumed to have adequate coverage to satisfy all claims in substantial part and which were also assumed to be fully funded to aggregate coverage limits.  The possible impairment of policies by certain large liquidated claims was anticipated and addressed in Part VIII of the Plan ADR by controlling the percentage and timing of the payment of those claims.  See Sterling Exh. 4, pp. 14 - 15, ¶ VIII.

2)       Malpractice Claims based on prepetition events against Debtors and against non-Debtors, including physicians, who were additional insureds on Debtors' malpractice policies, would be managed and channeled through the Plan ADR or else these claims against Debtors and the Debtors' insurance policies would be deemed waived and barred.  An exception was created for

11

those claimants who entered into an agreement or stipulation with the Debtors.  However, for these claim waiver provisions to be invoked, Debtors were required to give proper notice and an opportunity for the Malpractice Claimants to elect the Plan ADR procedure.

3)      Postpetition malpractice claims based on postpetition events against Debtors and against non-Debtors, including physicians and hospitals who could assert claims for reimbursement, contribution or indemnity against Debtors therefor, were to be handled in the ordinary course of business and paid either through Debtors' insurance policies or by the purchaser Sterling and its tail policies, depending on when asserted.

4)      All rights of both pre and postpetition malpractice claimants against non-Debtor third parties, except physicians and healthcare providers who were additional insureds on Debtors' malpractice policies, and against non-Debtor insurance policies were not to be affected by the Debtors' plan of reorganization.

5)      Similarly, the rights of hospitals to make indemnity and contribution claims against Debtors' insurance policies were not to be affected by the Debtors' plan of reorganization.

6)      The purchaser of Debtors' assets, Sterling, effective at Closing, would either assume Debtors' insurance policies or provide replacement policies to cover Debtors' pre and post-petition malpractice liabilities through Closing, and would provide tail policies so there would be continued insurance coverage for postpetition malpractice claims made through December 31, 2007.

7)      The physicians who were employed by, or contracted with, the Debtors and were covered as additional named insureds under Debtors' malpractice insurance policies for prepetition occurrences would generally be protected from execution, except through applicable insurance policies.

8)    All malpractice claims would be treated the same because all would be paid in full, since the aggregate limits of the malpractice insurance policies, as supplemented by Sterling with tail insurance policies as part of its purchase price obligation, appeared sufficient.

The present crisis was precipitated because the Plan ADR was based on faulty assumptions as to funding, was incomplete in failing to anticipate various contingencies that have come to pass, failed to clarify certain important issues, failed to address completely and with precision the distinctions between the handling of prepetition malpractice claims and policies and postpetition malpractice claims and policies, including the difference between pre-sale closing and post sale closing malpractice claims and policies, and attempted to respond to too many malpractice constituencies by being all things to all holders of malpractice claims.

The court does not have jurisdiction to rewrite Debtors' plan of reorganization.  The court does have jurisdiction to interpret the Plan, to clarify the Plan, and to fill in gaps to fulfill the intent of the Plan in light of the current shortage of insurance coverage for pre and post petition malpractice claims under certain applicable policies.  See Confirmation Order dated December 17, 2003, p. 39, ¶ 48; Second Amended Joint Plan of Reorganization, p. 31-33, § 12.1.  The court will not address any issues for pre or postpetition malpractice claims under insurance policies where either coverage has not been shown to be inadequate or the companies that issued the policies are being administered in receivership.  The policies excluded from this ruling include the Everest -031 policy, which the court has been advised by counsel is not impaired, and two policies that plaintiff Sterling has identified as TRA (APM 1501099) and WIIC (No. WPLPO 3500599), which the court is advised were issued by companies in receivership.  The two policies to which the clarifying order herein will apply are the Everest -021 policy and the AISLIC -435 policy.

13

III.

Plaintiffs have proposed a method for pro rata allocation of the remaining insurance proceeds that appears fair and equitable under the circumstances, and that appears consistent with the intent of Debtors' confirmed plan.  To apply this methodology, however, requires a definition of the pool of tort claimants who are eligible to recover claims from the AISLIC -435 policy.  The term of the AISLIC -435 policy ended at 12:0l a.m. EST on April 1, 2004.  See Sterling Exh. 5.  The Closing of Sterling's purchase of Debtors' assets was February 1, 2004.  Sterling presently takes the position that malpractice claims made in February and March, 2004, based on pre-Closing events should be included.  For a period after the Closing, these claims made post-Closing were being covered by and administered under a tail policy bound and to be issued by AISLIC, No. 4762470.  See Province Hosp. Exh. 1.

The court concludes that claims made in February and March, 2004 should not be included, in the first instance, in the pool of claims to be paid from AISLIC policy -435.  These claims are part of Sterling's obligation to provide tail insurance coverage upon the Closing.  If there is excess coverage available after satisfaction of all claims made before February 1, 2005, then the remaining coverage could be used for the claims filed in February and March, 2004.  The court's reasons for this conclusion are as follows, in no particular order of priority.

First, this was the way claims against the policies were administered by those responsible for doing so, including Sterling and its agent Western Litigation, in the period immediately following the Closing.  Their behavior demonstrates the most contemporaneous understanding of what the parties intended.

14

Second, the original binder for the tail coverage policy obtained by Sterling from AISLIC had an effective date of February 1, 2004.  See Province Hosp. Exh. 1.  Further, certain of the malpractice claims against Debtors that were made in February and March, 2004 were initially assigned to this policy for administration.

Third, Section 2.13 of the Asset Purchase Agreement with Sterling contemplated that Sterling would assume Debtors' medical malpractice liability claims filed after closing and would provide tail insurance coverage to fulfill that obligation.  The section provides, inter alia, that effective upon the Closing on February 1, 2004, Sterling agreed ". . . to assume all medical malpractice liabilities of Sellers' . . . providers. . . in respect to claims relating to acts . . . occurring from and after the Petition Date through and including the Closing Date (the "Post-Petition Medical Malpractice Liabilities"), and either to assume the related insurance policies of Sellers or to procure alternative or replacement policies and further, from and after the expiration of any existing insurance policies with respect to Post-Petition Medical Malpractice Liabilities, . . . to procure replacement policies  . . . that provide continued insurance coverage for the Post-Petition Medical Malpractice Liabilities with respect to claims made . . . at any time on or prior to December 31, 2007."  A reasonable reading of this commitment is that as of the Closing Date, namely, February 1, 2004, Sterling assumed the liability for post-petition malpractice claims arising against Debtors through Closing and would fund payment of those claims made through December 31, 2007, either by assuming Debtors' malpractice  liability insurance policies or by obtaining replacement policies and by obtaining tail coverage insurance policies.  To the extent there is any ambiguity in these provisions as to the commitment of Sterling with respect to the commencement of its obligation to provide tail insurance coverage from and after closing, it is belied by the actions of Sterling in

accepting this obligation post-Closing  as outlined in paragraphs First and Second above and hereafter.

Fourth, Sterling did not assume the Debtors' policies to the extent of providing post-Closing coverage for February and March, 2004 by paying the Collateralized Deductible Deposits that came due on the AISLIC -435 policy after Closing.  In other words, Sterling did not fund the AISLIC -435 policy to cover its post-Closing, assumed liabilities, i.e. claims made after closing based on pre-Closing events.  The Collateralized Deductible Deposit that was due in February, 2004 under the original policy schedule to provide the remaining aggregate coverage of $18,734,155 recited in Debtors' disclosure statement was $1,500,000.  Province Hosp. Exh. 25 at p. 32, Sched. 1.  See also Sterling Exh. 3 at 93.  However, that scheduled amount had been altered as of July 1, 2003 to $3,000,000, namely, deposits of $1,500,000 in each of February and March, 2004.  Id. at Endorsement No. 12.  The AISLIC -435 policy was then altered on October 21, 2003 to replace the fixed payment schedule with an optional payment schedule that would permit the Named Insured to make Collateralized Deductible Deposits in $500,000 increments at any time up to March 15, 2004, subject to an increased aggregate cap of $20,260,000.  Id. at Endorsement No. 15.  All of these endorsements were prior to both the auction sale of Debtors' assets and the Closing with Sterling. The point here, however, is that Sterling did not make any Collateralized Deductible Deposit after its Closing as of February 1, 2004.  It thus can not be said to have used Debtors' AISLIC -435 policy to cover its post-Closing purchase price obligation for Debtors' malpractice claims arising post-petition and pre-Closing, which were made after the Closing.

Fifth, the Plan ADR made the following disclosures, which track Section 2.13 of the Asset Purchase Agreement with Sterling.  ". . . RDA [Sterling] has agreed to assume all medical

16

malpractice liabilities of Sellers [Debtors] . . . in respect of claims relating to acts, . . . occurring from and after November 1, 2002 through the closing date under the APA [Asset Purchase Agreement], and either to assume the related insurance policies of Debtors or to procure alternative or replacement policies and further, from and after the expiration of any existing insurance policies . . . , RDA has agreed to procure replacement policies . . . that provide continued insurance coverage for such malpractice liabilities with respect to claims made . . . on or prior to December 31, 2007." Sterling Exh. 4, p. 4, ¶ I(E).  Sterling cannot be said to have assumed Debtors' AISLIC -435 policy for claims made after its Closing when it did not make the required Collateralized Deductible Deposits that should have been made during such post-Closing period to cover the claims made during that period.  Rather, it elected to provide an alternative or replacement policy, the AISLIC -470 policy, that was originally bound by AISLIC effective February 1, 2004 at 12:01 a.m. Province Hosp. Exh. 1.

Sixth, Debtors in their disclosure statement only undertook to maintain the insurance coverage "as a going concern."  Sterling Exh. 3, p. 93.  After the Closing, Debtors' assets had been sold, and Debtors were no longer a going concern.  It was then up to Sterling, since it had committed to provide continuing coverage as part of the winning purchase price it bid for the assets, as set forth in Section 2.13 of the Asset Purchase Agreement.  For these reasons, malpractice claims made on or after February 1, 2004 will be subordinated to those made before February 1, 2004 as to coverage under the AISLIC - 435 policy.

IV.

The clarifying procedures proposed by the plaintiffs include a provision for the proration of unpaid defense costs incurred prior to April 7, 2005, which is the date the trial in this proceeding commenced, on the theory that all existing claims against the policies should share proportionally in the shortfall, but conceding that defense costs must be paid prospectively to assure a defense. This rationale is justified for the AISLIC -435 policy, which is a pure indemnity policy, including defense costs, and which imposes no duty to defend on AISLIC. See Province Hosp. Exh. 25, Sec. I(A), p. 4. However, it is not appropriate for the Everest -021 policy where Everest has a direct duty to defend and the right to select counsel. See Province Hosp. Exh. 26, Sc. I, p. 1 and Sec. IV(C), p. 5. The date that will be used will be tied to the ruling hereon and consequent termination of the preliminary injunction.

V.

AISLIC and others have requested that an injunction be framed to protect physicians' assets from all malpractice claims arising from their services for Debtors, both prepetition and postpetition services and events. Such extended relief to postpetition malpractice claims would not be appropriate because it could amount to a material, substantive amendment to the terms of the confirmed plan. Compare Plan ADR Section I(F) (postpetition malpractice claimants) with section II(E) (prepetition Malpractice Claimants). The term "Malpractice Claims" is defined at Plan ADR Section I(B)(3) as limited to malpractice claims based on events occurring prepetition. Such extended injunctive relief would raise issues not involved in the present malpractice insurance

18

funding crisis.  Consequently, the injunction to be issued herein against execution on a physician's assets will be limited to prepetition Malpractice Claims.

An appropriate order will be entered which incorporates the conclusions reached herein.

**End of Opinion**

cc:    Roger Frankel, Esquire
      Swidler, Berlin et al.
      3000 K Street NW, Suite 300
      Washington, DC 20007

      Michael J. Lichtenstein, Esquire
      Shulman, Rogers, Gandal, Pordy &
         Ecker, P.A.
      11921 Rockville Pike
      Rockville, Maryland    20852

      Martin T. Fletcher, Esquire
      Stephen F. Fruin, Esquire
      Whiteford, Taylor & Preston, LLP
      Seven St. Paul Street, #1400
      Baltimore, Maryland    21202

      Harry Lee, Esquire
      George R. Calhoun, Esquire
      Steptoe & Johnson LLP
      1330 Connecticut Avenue, NW
      Washington, D.C.  20036

      Everest Indemnity Insurance Company
      Larry A. Frakes, EVP
      Westgate Corporate Center
      P.O. Box 830
      Liberty Corner, NJ  07938-0830

Everest Indemnity Insurance Company

Dennis Burke, General Counsel
Mt. McKinley Management, L.L.C.
Westgate Corporate Center
P.O. Box 830
Liberty Corner, NJ  07938-0830

David S. Cohen, Esquire
Milbank Tweed Hadley & McCloy,
 LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5417

Kristin Case Lawrence, Esquire
Bishop, Daneman & Simpson
2 N Charles Street, Suite 500
Baltimore, MD 21201

Frederick W.H. Carter, Esquire
John A. Roberts, Esquire
Venable LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland    21201

19

Brian A. Bash, Esquire
Matthew R. Goldman, Esquire
Baker & Hostetler, LLP
1900 E. Ninth Street, N.W., Suite 3200
Cleveland, Ohio   44114

Office of the U.S. Trustee
300 West Pratt Street, Suite 350
Baltimore, Maryland   21201

Joel I. Sher, Esquire
Shapiro Sher Guinot & Sandler
36 S. Charles Street, 20th Floor
Baltimore, MD 21201-3147

Valerie Leatherwood, Esquire
Sidley Austin Brown & Wood LLP
1501 K Street, NW
Washington, DC  20005

Adam Hiller, Esquire
Pepper Hamilton
Hercules Plaza, Suite 5100
1313 North Market Street
Wilmington, Delaware 19801

Patrick J. Potter, Esquire
Shaw Pittman LLP
2300 N Street, N.W.
Washington, DC  20037

James C. Olson, Esquire
111 South Calvert Street, Suite 2700
Baltimore, MD 21202

Mary Frances Ebersole, Esquire
Tydings & Rosenberg LLP
100 East Pratt Street
Baltimore, MD 21202

Carrie B. Weinfeld, Esquire
Linowes and Blocher LLP
7200 Wisconsin Avenue, Suite 800
Bethesda, MD 20814-4842

Robert A. Guy, Jr., Esquire
Waller Lansden Dortch & Davis,
   PLLC
511 Union Street, Suite 2700
Nashville, TN  37219

And the Medical Malpractice claimants who
are defendants